# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 3, 2013

Lyle W. Cayce
Clerk

No. 11-51205

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

BOOKER ANDERSON-JAY POWELL; APRIL MARIE AKIN

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Texas

Before JONES, SMITH, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This appeal arises from the conviction and sentencing of Booker Anderson-Jay Powell ("Powell") and April Marie Akin ("Akin") on charges of conspiracy to possess cocaine base ("crack cocaine") with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2. On appeal, Akin and Powell challenge the denials of their motions to suppress evidence under the Fourth Amendment, Powell challenges the admission of his co-defendant's inculpatory statements under the *Bruton* doctrine, Akin challenges the legal sufficiency of the evidence supporting conviction, and Powell challenges his sentence on two grounds—the propriety of

No. 11-51205

a two-level enhancement entered under section 3B1.4 of the United States Sentencing Guidelines, and the substantive reasonableness of the final sentence imposed. For the reasons that follow, we AFFIRM the judgment of the district court.

## I

Akin and Powell were students at Odessa College. They lived together in Odessa and had an infant daughter who was 18-months old at the time of trial. On January 13, 2011, Officer Dwayne Gerber, of the Lubbock Police Department, received a call from Cory Bracy ("Bracy"), a confidential informant who had worked with Officer Gerber since 2010.[1] Gerber testified that he had received credible information from Bracy in the past, but he learned that Bracy had lied to him about whether he was cooking crack cocaine and dealing drugs while serving as an informant. Bracy told Officer Gerber that a man called "Little Book" and a woman who had just left his home had purchased a quantity of crack cocaine and were en route to Midland, where they intended to sell the narcotics. Bracy described the make, possible model, and color of the vehicle. He also recounted the first three characters of the license plate. Bracy did not inform Officer Gerber that he had cooked the crack cocaine which "Little Book" had just purchased. Officer Gerber took this information to the Midland Police. He called Detective Marker, conveying the tip he had just received and stating that, in his belief, Bracy was sufficiently reliable for the tip to provide probable cause for a vehicle stop.

Detective Marker and his colleague Sergeant Fain established a surveillance position in Lamesa, Texas—a town on the most direct route between Lubbock and Midland. In time, the officers observed a vehicle matching the description provided by Officer Gerber. They began following the vehicle, each

---

[1] Bracy had previously been an informant for Officer Gerber in 1997 and 1998. The two individuals had not been in contact during the interim period.

in an unmarked car. The officers followed the vehicle until it reached Midland, verifying its intended destination. The officers observed the vehicle change lanes without signaling and fail to maintain a signal lane of traffic. However, the unmarked cars could not perform a traffic stop, so they contacted the Midland Police to send a marked canine unit. Heeding this call, Officer Welch and his canine, Bruno, joined in the surveillance. Officer Welch observed the vehicle fail to maintain a single lane of traffic, and initiated a vehicle stop.

Powell, the driver, pulled the vehicle onto the grassy center median of Loop 250 in Midland. Akin and their infant daughter were passengers in the car. Officer Welch testified that he asked Powell to exit the vehicle, frisked him for weapons, and asked Powell to accompany him to the patrol vehicle to discuss the traffic violation where there was less danger from oncoming traffic. Officer Welch testified Powell consented to a search of his pockets for narcotics. He also performed a horizontal gaze nystagmus test and determined Powell was not under the influence. Officer Welch returned to the vehicle to speak with Akin. Approximately ten minutes into the traffic stop, Officer Welch ran Powell's and Akin's names through law enforcement databases to check for warrants. At this point, Officer Welch testified that he asked Powell for consent to search the vehicle, which was given. Powell disputes this fact. Midland Police policy requires occupants be removed from a car before it is searched. There was no safe location at the scene for Akin and her infant daughter to wait during the search. It was a cold winter's evening on the side of a busy Texas state highway. Officer Welch's canine unit could not accommodate the young mother and child and the unmarked vehicles were not on location. Officer Welch called for a back-up vehicle to remedy this problem. They waited 20–30 minutes for its arrival.

During this wait, Powell told Officer Welch that he "was coming from an apartment complex in Midland." However, Powell could not identify the name of the complex or its street location. When the search commenced, Officer Welch

and Bruno entered the vehicle. Bruno "alerted" to the backseat of the car. Midland's police dogs are trained by a private company prior to their arrival, then they undergo an additional 20 hours of training with their handler and receive formal certification as a drug detection dog. Bruno was new to the force and had not yet received formal certification.  Though his formal certification was received six weeks after the instant search, Officer Welch—who had handled two other drug dogs—testified that Bruno was fully trained.  After alerting, Bruno was returned to his kennel.  Officer Welch and other officers began searching the car.   Detective Marker and Sargent Fain arrived on scene and asked Akin about her whereabouts.  According to trial testimony, Akin stated she had come from Lubbock. During the search Powell was placed in handcuffs.

Because of inclement weather and the dangerous location of the vehicle, the officers moved the car to the Midland police station to continue the search. According to Detective Marker, although the officers never sought their consent for the move, Akin and Powell did not object.  Powell contests this point.  At the police station, the officers conducted a more thorough search of the vehicle. Detective Marker reported smelling drugs near the front of the car.  The officers pried a button off of the dashboard.  With a flashlight they could see drugs and U.S. currency stashed behind the dash.  The officers recovered approximately 240 grams of crack cocaine and $1,400 in United States currency.  Akin and Powell were interviewed in separate rooms.  Detective Marker and Sergeant Fain testified that Akin admitted that she had been to Lubbock to meet with Bracy, also known as "Caine," to pick up crack cocaine.

Officers heard a ringing cell phone during the search of the car.  The phone was located between the door and the driver's seat.  Powell denied ownership of the phone.  Akin claimed the phone belonged to Powell, denying her personal ownership.  Later in the evening, officers looked at the phone's contents and

identified a series of text messages between Powell and Bracy concerning their trip to Lubbock to purchase crack cocaine. At trial, the district court admitted the drugs, currency, cell phone, text messages and other evidence discovered from the search of the car.

Before trial, Akin and Powell filed motions to suppress evidence obtained during the search of the vehicle, which were denied. Powell filed a pre-trial motion in limine under the Confrontation Clause of the Sixth Amendment to exclude witness testimony about Akin's out of court statements. The district court denied this order but entered an order that the "government will not elicit a response that requires" a witness to make any statement one defendant made concerning the other.

Akin and Powell were tried by jury in a joint trial. Multiple witnesses testified as to Akin's and Powell's involvement in crack cocaine dealing. For example, Taeshiba Bracy, Cory Bracy's sister, testified that she and Powell sold crack cocaine from her beauty salon—approximately two or three kilograms in total. Taeshiba testified that Akin would bring more crack cocaine when she and Powell would exhaust their supply. Ashley Nicole Smith-McDowell testified that she bought crack from Powell since August 2010. Bracy testified that he and Powell would cook crack cocaine together with some frequency. He further stated that Akin would accompany Powell on his trips. Powell elected to testify, Akin did not. At trial, Akin's statements were introduced against her through investigating police officers' testimony. Sergeant Fain testified, "She said that she had been to Lubbock and had met a guy named Caine and picked up some . . . cocaine, crack cocaine, was picked up and she drove back to Midland." Detective Marker testified: "Ms. Akin stated that she had traveled from Odessa to Lubbock on this date, the 13th, and had obtained a quantity of crack cocaine . . . from somebody named Caine." During his cross-examination, Powell asserted that he did not go to Lubbock on the day in question. In response, the

No. 11-51205

prosecution challenged Powell with Akin's out of court statements, asking him to explain them.

The jury returned a guilty verdict for both parties on both counts. The district court sentenced Powell to 188 months of imprisonment and 5 years of supervised release. The district court included a sentence enhancement for Powell's use of his minor daughter in the commission of the offense. Akin was sentenced to 120 months of imprisonment and 5 years of supervised release. This timely appeal followed.

## II

Appellants contend the district court erred in denying their respective motions to suppress evidence gathered during the vehicle search. Powell and Akin each challenge the admission of the crack cocaine and U.S. currency discovered behind the dashboard. Akin additionally challenges the admissibility of the cell phone found under the driver's seat and the information it contained.

"When reviewing a district court's denial of a motion to suppress evidence as obtained in violation of the Fourth Amendment, we review the factual determinations for clear error and the legal conclusions de novo." *United States v. Pompa*, 434 F.3d 800, 803 (5th Cir. 2005). The evidence is viewed in the light most favorable to the party who prevailed below—here, the government. *See United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993). And, in our review of the case, "we may affirm the district court's decision on any basis established by the record." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999).

### A

### 1

The validity of the initial traffic stop is not contested. Both Powell and Akin contest the reasonableness of the investigatory detention and search that followed the initial stop. Powell asserts that the detention exceeded its objective

purpose. Akin asserts that she was detained beyond the time necessary to process the traffic violation. In response, the government asserts that the traffic violation was not the only justification for the stop—additionally, the police had reasonable suspicion, based on Bracy's tip to the police, subsequent corroboration, and the appellants' conflicting statements, that Powell and Akin were transporting a significant amount of crack cocaine. The government contends that the officers' actions were reasonably related to this additional basis of reasonable suspicion and therefore complied with the Constitution. We agree.

The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007). First, we determine whether stopping the vehicle was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. In the context of a traffic stop, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459. F.3d. 627, 631 (5th Cir. 2006). Our assessment of reasonable suspicion is based on the totality of the circumstances. *Id.* Furthermore, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation. The collective knowledge theory for reasonable suspicion applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts. *See United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). Reasonable suspicion can be formed by a confidential informant's tip so long as the information is marked by "indicia of reliability." *Adams v. Williams,* 407 U.S. 143, 147 (1972); *United States v. Zamora,* 661 F.3d 200, 207 (5th Cir. 2011). In *United States v.*

No. 11-51205

*Martinez*, 486 F. 3d 855, 861 (5th Cir. 2007), we discussed a number of the factors applied in determining whether a tip provides reasonable suspicion, including: "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale." *Id*.

The informant's tip to Officer Gerber set this chain of events in motion. Powell and Akin claim that Bracy's tip was not sufficiently reliable to provide independent reasonable suspicion of a drug crime. They allege Bracy's status as a drug-dealer and his concealment of this fact from Officer Gerber render his tip categorically unreliable. Bracy's personal credibility and reliability is certainly questionable. Bracy began serving as an informant for Officer Gerber of the Lubbock Police in September or October of 2010. Officer Gerber testified at trial[2] that Bracy provided law enforcement with credible information, which was corroborated by law enforcement. However, Officer Gerber later discovered that Bracy was selling crack—a status that Bracy initially concealed. Officer Gerber's trial testimony established that Bracy had lied about his current involvement with drugs and drug crime. In fact, Bracy is the very individual who sold Powell and Akin the drugs discussed in the tip that were later discovered in the car. At trial, Officer Gerber conceded that an *informant* involved in drug dealing loses reliability, but noted that the *information* might still be credible.

Bracy's role in the sale of the crack cocaine to Akin and Powell is a clear mark against his credibility. However, we are mindful of the government's observation at oral argument that informants in criminal investigations are

---

[2] When reviewing a district court's determination in a motion to suppress, we may consider evidence presented at trial in addition to evidence presented at the initial suppression hearing. *See United States v. Basey*, 816 F.3d 980, 983 n.1 (5th Cir. 1987).

No. 11-51205

rarely removed from all aspects of the underlying criminality. While Bracy's involvement in selling drugs and his concealment of this fact from Officer Gerber certainly cut against his personal credibility and reliability, this is not the end of our analysis. In assessing reasonable suspicion, we must account for the totality of the circumstances. *See Estrada*, 459. F.3d. at 631. Here, there are several additional circumstances to consider.

First, the information contained in Bracy's tip was very specific. It was based on his first-hand knowledge of events that had just taken place. Bracy's tip to Gerber indicated two "guys" were en route from his house to Midland with a large quantity of crack. He identified these "guys" as "Little Book" and a female companion. He further provided a very specific description of the vehicle in which they traveled. Bracy reported the car's make (a Ford), the possible model (either a Fusion or a Focus), and the first three letters of the license plate affixed to the car (BV5). Additionally, officers in the field were readily able to verify this information. Acting on Bracy's tip, Midland detectives waited in Lamesa, a town on the most direct route from Bracy's house to Midland. There, they observed a car matching Bracy's description and followed that car to the Midland city limits in order to verify its intended destination. When Officer Welch stopped the car he discovered Booker Powell, also known as "Little Book,"[3] and April Marie Akin, a female—just as Bracy's tip predicted. Finally, Bracy's tip was exceedingly fresh. Officer Gerber received Bracy's call around 5:00 P.M. on January 13, 2011. Officer Welch initiated the traffic stop approximately two hours later.[4]

---

[3] Witnesses at trial connected Powell to the alias "Little Book."

[4] The communication in this case between the officers is sufficient to trigger the collective knowledge theory. Officer Gerber was in direct communication with the Midland police and communicated the underlying basis of the tip. This provided the Midland police with the same basis of reasonable suspicion as Officer Gerber had.

9

No. 11-51205

The specificity, predictive value, and recency of Bracy's tip are sufficiently strong to balance the flaws in Bracy's personal credibility and reliability. A total evaluation of these factors shows that the informant tip was supported by sufficient "indicia of reliability" to satisfy the reasonable suspicion requirements under *Terry*.

In this case, the reasonable suspicion provided by Bracy's tip rests on a strong foundation when viewed alongside cases finding reasonable suspicion in similar circumstances. *Alabama v. White*, 496 U.S. 325 (1990), provides a clear example. In that case, the Supreme Court held that officers had reasonable suspicion that White possessed cocaine even though they did not personally observe any illegal activity. *Id.* In *White,* police received an anonymous phone call stating that a woman named White would be in possession of a quantity of cocaine in a brown leather case. The anonymous informant told police that the woman would leave a particular apartment around a specific time in a brown station wagon with a damaged rear light. The informant told police White would travel to a specific motel. Based on this tip, officers watched a woman leave the described apartment and drive the described vehicle along the most direct route to the described motel. The officers stopped the station wagon before it arrived, an act the Court deemed constitutional. The specificity and accuracy of the informant's tip in *White*, and the police's ability to verify its contents in the field prior to effecting the stop are strikingly similar to the instant case. Here, moreover, the argument for reasonable suspicion based on the informant tip is stronger than that in *White*. Whereas the informant in *White* was anonymous, Bracy is a *known* informant. Bracy's credibility and reliability can at least be assessed as part of our reasonable suspicion analysis. In *White*, the Court had no means of assessing the *anonymous* informant's credibility, and nonetheless determined that other indicia of reliability supported reasonable suspicion.

10

No. 11-51205

Officer Welch initiated the traffic stop with two initial justifications: traffic violations and reasonable suspicion of drug crime. Consequently, under the second prong of *Terry*, the officers' actions were permissible under the Fourth Amendment because they were reasonably related in scope to the drug crime justification. We find that the officer's reasonable suspicion of drug crime justified the time taken to process the initial traffic infraction, the scope of Officer Welch's questioning, and the delay in waiting for the canine unit. Reasonable suspicion of the drug crime provided an independent basis for prolonging the investigatory detention beyond the parameters of a run-of-the-mill traffic stop.[5]

**2**

While reasonable suspicion of drug crime provided the necessary Fourth Amendment basis for the prolonged traffic stop, the discovery of the drugs and currency at the center of the motions to suppress did not immediately occur during this stop. Police located the contraband only after they searched the interior of the vehicle, a drug dog alerted to the possible presence of contraband inside the vehicle, officers relocated the vehicle to the Midland police station for additional inspection, and Detective Marker removed a piece of the dashboard. Akin and Powell challenge the constitutionality of each of these actions and assert them as grounds for suppression by operation of the exclusionary rule.

Reasonable suspicion is insufficient to permit a general search under the Constitution. Reasonable suspicion may be sufficient for police to perform a protective search of a vehicle's passenger compartment for weapons to ensure officer safety, *see Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (explaining

---

[5] Akin and Powell challenge the reasonableness of the investigatory detention based upon the traffic infraction justification alone. They assert that the police improperly conducted the traffic stop and illegally prolonged their detention under our standards for vehicle stops. *See, e.g., United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999); *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc). Because we find that the police had reasonable suspicion of drug crime, providing an adequate basis for the scope and duration of the stop from the outset, we need not reach these arguments.

permissibility of automobile frisks for limited purpose of ensuring officer safety in presence of armed or dangerous suspects), but more is needed to justify a full search of the interior of the vehicle.  In this case, the police needed probable cause or another factor justifying a warrantless search under the Fourth Amendment—such as consent—in order to carry out a full search of the interior. *Accord Florida v. Royer,* 460 U.S. 491, 499 (explaining that *Terry* is a limited exception to the probable cause rule).  The district court held that the full range of this search was supported by Powell's voluntary consent or, in the alternative, by the existence of probable cause.  We agree that the police had probable cause to believe the vehicle  contained crack cocaine, providing a sufficient constitutional basis for searching the interior of the vehicle, relocating the vehicle, and removing a piece of the dashboard.[6]

An exception to the Fourth Amendment's warrant requirement exists when a police officer has probable cause to search an automobile for contraband. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973).  The primary basis for probable cause in this case, like reasonable suspicion, is Bracy's tip.  To determine whether an informant's tip is sufficient to establish probable cause, courts examine the totality of the circumstances.  *Gates*, 426 U.S. at 234.

For the same reasons Bracy's tip was sufficient to establish reasonable suspicion, it was sufficient to provide probable cause.  The tip, despite Bracy's personal credibility problems, is supported by strong indicia of reliability—corroboration, specificity and recency.[7]  In *Illinois v. Gates*, the Court found that probable cause was established by an anonymous letter indicating defendants were involved in activities violating state drug laws.  *Gates*, 462 U.S. at 241–44.  The letter predicted future criminal activities that were largely

---

[6] Because we find that probable cause is sufficient to support law enforcement's action in this case, we do not address the myriad issues concerning consent and the scope thereof.

[7] *See supra* Section II.A.

No. 11-51205

corroborated by law enforcement. *Id.* The *Gates* Court noted that informants' statements may be relied upon for probable cause "so long as [they] are reasonably corroborated by other matters within the officer's knowledge." *Id.* at 241. Similarly, in *Draper v. United States*, the Court held that an informant's tip established probable cause even though the informant gave no indication of the basis of his claim that a suspect in possession of heroin would arrive in Denver, by train from Chicago, on either of two days. 358 U.S. 307, 308 (1959). This informant's tip contained a detailed physical description of the suspect, predicted the suspect's clothing, and asserted that the suspect would be walking "real fast." *Id.*

Here, Bracy's tip was at least as credible as those sufficient to establish probable cause in *Gates* and *Draper*. Unlike the informants in those two cases, Bracy provided Officer Gerber with the specific basis of his knowledge: he stated that the subjects had just been in his home and were now traveling with the crack cocaine in a specific vehicle to Midland. Here, as in *Gates* and *Draper*, law enforcement corroborated the informant's information in several material respects—the car's destination, make, model, color, passengers, and a partial license plate. Officer Gerber received the tip directly from Bracy and then communicated it to the Midland police officers and detectives who effected the stop and search.[8] Bracy's tip provided law enforcement with probable cause that Powell and Akin were transporting crack cocaine in the vehicle from the outset.

Because the police had probable cause to believe the car contained crack cocaine, they could validly perform a warrantless search of the vehicle's interior to locate that contraband. Probable cause also permitted Bruno to enter and search the interior of the vehicle. A canine "sniff" test is not a "search" for Fourth Amendment purposes and is exempt from the probable cause

---

[8] *See supra* note 4 (discussing the collective knowledge theory).

No. 11-51205

requirement so long as the dog does not enter the home or vehicle. *See Illinois v. Caballes*, 543 U.S. 405 (2005). Here, Bruno did not merely sniff the vehicle's exterior, he actually entered the vehicle and alerted on the back seat.[9] In the presence of probable cause, this action was constitutionally permissible.

Furthermore, because law enforcement had probable cause to conduct a search of the vehicle, moving the car to a safer location—the Midland Police station—did not undermine the constitutionality of the search. *See United States v. Estrada*, 459 F.3d 627, 634 n.7 (5th Cir. 2006) (collecting sources). In the presence of probable cause, "given the scope of the initial intrusion caused by seizure of an automobile, there is no constitutional difference between the proper search on [a] highway and [a] later search at [a police] station." *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010). Here, moving the vehicle was supported by probable cause stemming from Bracy's tip and does not constitute grounds for suppressing the drug and U.S. currency evidence.[10]

Lastly, the existence of probable cause to believe the vehicle contained crack cocaine permitted the officers to remove a piece of the dashboard during the continuation of the search at the police station. In *United States v. Zucco,*

---

[9] At the time of the search, Bruno had not completed final paper-certification process with the Midland Police. Bruno had, however, undergone certain training programs. The district court determined that Bruno's alert provided a basis for probable cause, justifying the officers' continued search of the vehicle. On appeal, the parties have devoted significant briefing to the validity of Bruno's alert, his training status, and the meaning of the Supreme Court's recent discussion of dog alerts in *Florida v. Harris*, 133 S.Ct. 1050 (2013). Because we find that Bracy's tip provided probable cause from the outset, we need not reach this series of issues. We note, in passing, that this situation appears very unusual. Bruno, the canine, alerted to the presence of crack in the backseat—where none was found. Detective Marker, the human, asserts that he smelled crack cocaine in the dashboard area—where drugs were found but where the canine did not alert. In any event, Bruno's alert (if valid) could only have *added* to probable cause for the search. In no way did Bruno's actions detract from the existing probable cause based on Bracy's tip.

[10] Because probable cause provides a sufficient legal basis for moving the vehicle during the search, we do not address whether the move falls within the scope of any consent Powell may have given law enforcement during the traffic stop.

14

No. 11-51205

71 F.3d 188, 191–92 (5th Cir. 1995), we determined that "every part of a vehicle which may conceal the object of the search may be searched" when the search is supported by probable cause.  In *Zucco*, law enforcement officers had probable cause that the vehicle contained drugs and moved the vehicle to a police station for inspection.   The search included "dismantling a wall of a vehicle" to determine whether drugs were hidden in the interior.  *Id.* at 191. Here, the officers removed a button from the dashboard.  With use of a flashlight, the officers could see packaged crack cocaine and U.S. currency hidden behind the dash.  The area behind a dashboard is an area capable of concealing the object of this search, crack cocaine. Thus, in the presence of probable cause, removing a piece of the dashboard to search for the drugs was constitutionally permissible.

## B

Akin separately challenges the district court's denial of her motion to suppress evidence obtained from the cell phone discovered during the vehicle search.

Standing is a central component of Fourth Amendment jurisprudence. "Fourth Amendment rights . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).  A defendant seeking to suppress evidence under the Fourth Amendment must demonstrate that his or her individual rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). This demonstration requires that a defendant prove both a subjective expectation of privacy regarding the item searched and that the expectation of privacy is objectively reasonable.  *United States v. Finley*, 477 F.3d 250, 258 (5th Cir. 2007).  Under this rubric, a person has no standing to challenge a search or seizure of property that was voluntarily abandoned.  *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993) (holding defendant lacked standing to object to search of garment bag after denying ownership and voluntarily abandoning the

15

bag in a motel room).[11]   Here, Detective Marker heard a cell phone ringing during the vehicle search at the police station.  After several rings, the detective located the phone between the driver's door and the seat.  Powell denied the phone was his.  When asked about the ownership of the phone, Akin said that it belonged to Powell.  In this, she disclaimed personal connection to the phone.  As a consequence of her statements abandoning the cell phone, she lacks standing to challenge the admissibility of the phone and the records contained therein.

Akin does not dispute that she denied ownership of the phone.  Rather, she challenges the governing law in light of the Supreme Court's decision in *Brendlin v. California*, 551 U.S. 249 (2007).  Akin asserts that *Brendlin* allows a passenger to object to the admission of *any* evidence seized following a traffic stop and detention in which the passenger is seized.  We disagree.  In *Brendlin*, the Court held  that when the police stop a car, passengers in the car are "seized" under the Fourth Amendment to the same extent as a driver and thus have individual standing to challenge the *stop's* constitutionality.  *Brendlin is* clearly focused on the Fourth Amendment implications of a police stop on an individual's person and freedom of movement—the seizure of the *person*.  The Court concludes that the passenger was "seized from the moment [the driver's car] came to a halt on the side of the road."  Nothing in the Court's opinion alters the standing analysis for searching an area of a vehicle or an item found in a vehicle.  To gain Fourth Amendment standing to challenge the validity of a search—not the validity of the underlying seizure—passengers must continue to show a "legitimate expectation of privacy" in the area or item searched.  *See Rakas*, 439 U.S. at 148.  Having abandoned the cell phone, Akin can make no

---

[11] *See also United States v. Canady*, 615 F.2d 694 (5th Cir. 1980) (finding no legitimate expectation of privacy in a suitcase after defendant disclaimed ownership of the suitcase several times at an airport security checkpoint); *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973) (en banc) (determining defendants lacked standing to challenge admissibility of abandoned briefcases).

such showing. Therefore, we hold that the district court did not err in denying Powell's and Akin's respective motions to suppress.

## III

Akin claims that the admissible evidence at trial was legally insufficient to support her conviction. Akin moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) at the end of the prosecution's case and renewed the motion at the close of all evidence, thereby preserving the issue for review.

When reviewing the legal sufficiency of a conviction, we consider the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We will not reweigh the evidence or assess the credibility of witnesses. *United States v. Owens*, 683 F.3d 93, 101 (5th Cir. 2012).

Akin's central assertion is that the evidence against her would have been insufficient had the motion to suppress been granted. Akin contends that the cocaine, currency, cell phone, text messages from the phone, and Akin's statements to the police were inadmissible and should not have been considered by the trier of fact. However, as we concluded above, the stop and search of the vehicle complied with the Fourth Amendment and the fruits of those actions were properly admissible.[12] Akin does not challenge the sufficiency of the evidence actually presented at trial.[13] Akin does assert that witnesses for the government were unreliable, that each had motive to lie, and that none of the

---

[12] *See supra* Section II.

[13] Given Akin's challenge to the evidence subject to her motion to suppress in this appeal, we will not review the panoply of facts adduced during the multi-day trial and their relationship to the essential elements of the crime in this opinion. The district court's Order Denying Defendant Akin's Motion for New Trial concisely addresses the legal sufficiency of evidence presented at trial, and we agree with its conclusions.

witnesses' accusations could be proven by corroborating evidence. These contentions go to the weight of the evidence and the credibility of witnesses—factors for the trier of fact and the trial judge, not a Court of Appeals.[14] Because Akin's challenge to the legal sufficiency of the evidence supporting conviction rests entirely on suppressing the evidence obtained from the search, it must fail. We find that the evidence was legally sufficient to support Akin's conviction.

## IV

Powell's *Bruton* claims, which we consider next, carry greater weight. Powell and Akin were tried jointly. Powell elected to testify in his own defense. Akin exercised her Fifth Amendment right not to do so. At trial, the government introduced Akin's out-of-court confession through Detective Marker's in-court testimony. On appeal, Powell claims the introduction of Akin's statements, combined with his inability to cross-examine Akin about those statements, violated his Sixth Amendment right to confront the witnesses against him under *Bruton v. United States*, 391 U.S. 123 (1968). There are two facets to the *Bruton* issue in this case. Akin's statements were initially introduced through Detective Marker and Sergeant Fain. Later, the prosecution used these statements to cross-examine Powell. Powell alleges a *Bruton* error in each instance. He claims the language in the statement plainly violates *Bruton* and also asserts that the prosecutor's explicit use of Akin's statements against him—repeatedly asking whether Powell could explain those statements—violates the Confrontation Clause.

---

[14] *See United States v. Davis*, 752 F.2d 963, 968 (5th Cir. 1985) ("Because it is the sole province of the jury to weigh the evidence and the credibility of the witnesses, an appellate court cannot rebalance that assessment of credibility. Therefore, the appropriate question as to sufficiency of the evidence is to ask merely whether there exists in the record substantial evidence in support of the jury's finding.").

No. 11-51205

The core concern of the *Bruton* doctrine is protection of a criminal defendant's Sixth Amendment Confrontation Clause rights. "While we review constitutional challenges de novo, the trial court's evidentiary decisions on a *Bruton* issue are reviewed for abuse of discretion." *United States v. Jiminez*, 509 F.3d 682, 691 (5th Cir. 2007) (internal citations omitted). Nonetheless, a *Bruton* error is subject to harmless error analysis. *Id.* (citing *United States v. Matthews*, 178 F.3d 295, 300 (5th Cir. 1999).

Under the Confrontation Clause, a criminal defendant is guaranteed the right to "be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court held in *Bruton* that a defendant's Confrontation Clause rights were violated by the admission of a non-testifying co-defendant's confession that directly implicated the defendant in the criminal act, even though the trial court issued a limiting instruction to the jury. *Bruton*, 391 U.S. at 126, 137. The scope of *Bruton* was later clarified in *Richardson v. Marsh*, in which the Court found a non-testifying co-defendant's confession constitutionally admissible when it was redacted to include references only to the non-testifying co-defendant and a third person, not the defendant, and the trial court gave a limiting instruction to the jury. 481 U.S. 200, 203 (1987). Significant in *Richardson* is the fact that the confession did not implicate the defendant on its face. Any implication of the defendant in the admitted statement required linkage with other trial evidence. *Id.* *Richardson*'s scope was clarified in *Gray v. Maryland*, 523 U.S. 185 (1998), in which the Court determined that modifying a non-testifying co-defendant's statement by replacing the defendant's name with the term "deleted" or "deletion" is insufficient to avoid implicating the defendant.

The key analytic factor in *Richardson* is that the statement did not clearly refer to the defendant and could only be linked through additional evidentiary material. In *United States v. Vejar-Urias,* 165 F.3d 337 (5th Cir. 1999), we

19

determined that a defendant's Confrontation Clause rights were violated when a non-testifying co-defendant's inculpatory statement was altered by using the word "someone" instead of the defendant's name. *Id.* at 340. Our logic tracked the Court in *Richardson*: "Where. . . it is obvious from consideration of the confession as a whole that [the statement refers] to the defendant, then admitting it does violate *Bruton* . . . ." *Id.*

### A

Akin's out-of-court statements were introduced through law enforcement officers. On direct examination, the prosecution asked Detective Marker to recount Akin's statements about her activities prior to being stopped by the Midland police. After an objection from defense counsel, the detective testified as follows: "Ms. Akin stated that she had traveled from Odessa to Lubbock on this date, the 13th, and had obtained a quantity of crack cocaine. . . . She stated that she had obtained the crack cocaine from somebody named Caine."[15] Sergeant Fain testified that Akin, "said she had been to Lubbock and had met with a guy named Caine and picked up some . . . crack cocaine . . . and drove back to Midland." Akin's statements, as admitted into evidence, did not violate Powell's Confrontation Clause rights. As admitted, Akin's statements focus only on her personal actions and personal knowledge about the crack cocaine. On their face, the statements do not even acknowledge that there was another person present. Here, Powell could only be implicated by Akin's statements when they were considered alongside other evidence showing Powell was in the car. This statement carries all the hallmarks of the one deemed permissible in *Richardson.*

Powell's attempt to distinguish *Richardson* is unavailing. Powell claims that the statement in *Richardson* was admissible because the non-testifying co-

---

[15] Trial testimony established that Bracy used the alias "Caine."

defendant's statements had to be linked to other evidence later introduced at trial—namely the defendant's own testimony—so the linkage between the statement and the defendant was not immediately apparent when the statement was introduced.    By contrast, Powell claims, Akin's statement could be immediately linked to him because it was well established that Akin and Powell were in the same vehicle.  This is unconvincing.  *Richardson* does not suggest that the source of the linking factors—the defendant's own testimony—was significant.    Rather, *Richardson* focuses on whether the statement facially implicates the defendant—or at least acknowledges the existence of another person.  Here, Akin's statements do not.

Neither is Akin's statement like the one we held violative of *Bruton* in *Vejar-Urias*.  In that case, the defendant's name was replaced with the term "someone." As in *Gray*, we found this form of name-replacement does not sufficiently remove the defendant from the non-testifying co-defendant's inculpatory statement.  The key to our analysis is that the statement, despite removing the defendant's actual name, could be readily said to facially identify the defendant.  This is not the case here.  Detective Marker's phrasing of Akin's statements directly focused the listener on what "she"—Akin—said, did, knew, or observed.  The statements, as admitted, did not indicate the existence of anybody else.    Powell's involvement is only ascertained with reference to independent facts presented at trial.

We hold that Akin's statements were not in the class of statements that violate *Bruton*.  The composition of the statements did not directly implicate Powell—they spoke only of Akin. Consequently, their admission into evidence did not violate Powell's Confrontation Clause rights.

**B**

While the statements admitted in evidence against Powell do not violate the Confrontation Clause, the prosecution's use of these statements for cross

No. 11-51205

examination purposes does.[16]  Powell elected to testify at his trial.  On cross-examination the prosecutor asked a series of questions about Akin's statements, demanding that Powell explain her meaning.  The prosecutor asked, "Can you explain how your wife, as you call her, told Detective Marker she had made three trips to Caine to pick up crack cocaine and come back to Midland, Texas?"  When Powell dodged to avoid giving a full answer to the question, the prosecutor pushed the point four times more:  "Sir, can you explain that statement?"; "Sir, I ask the questions.  Can you explain that statement?"; "So you can't—you can't explain it?"; "So your testimony is, sir—I'm asking the questions.  Your testimony is you can't explain it?"

A key component of the Court's analysis in *Bruton* is that there is a substantial risk that juries, despite any instructions to the contrary, will improperly use a non-testifying  co-defendant's inculpatory statements against the defendant—so powerful is this form of evidence.[17]  *Bruton*, 391 U.S. at 126

---

[16] We review this issue for plain error.  Powell did not object to this specific line of questions at trial.  He did raise the *Bruton* issues via a motion in limine and he made renewed objections during the officers' trial testimony introducing Akin's out-of-court statements.  He did not object during the prosecutor's cross-examination. However, we have held that, without a contemporaneous objection, a standing motion in limine is insufficient to preserve a point of error.  *See United States v. Graves*, 5 F.3d 1546, 1552 (5th Cir. 1993) ("[T]he rationale for requiring either a renewed objection at trial, or an offer of proof, is to allow the trial judge to reconsider his in limine ruling with the benefit of having been witness to the unfolding events at trial.").  Here, we hold that the initial objection to the admissibility of Akin's out-of-court statements does not carry-over to the prosecutor's use of those statements in cross-examination.  Although the statements were properly admitted, a separate and proper objection to their use against Powell should have been sustained.  A claim of error not preserved at trial is reviewed for plain error only.  Fed. R. Crim. P. 54(B).  Powell can only prevail on plain error review by showing: (1) error, (2) that is plain,(3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *See United States v. Garza*, 429 F.3d 165, 169 (5th Cir. 2006), *cert. denied*, 546 U.S. 1220 (2006).  Accordingly, we proceed.

[17] Notwithstanding the Government's assertion to the contrary, *see* Br. for the Appellee 61, the trial record does not reflect any limiting instructions concerning the proper use of Akin's out-of-court statements.  The district court did not issue instructions to the jury orally at the time the evidence was admitted or in its written charge before deliberations.  Although neither party raises the issue of the district court's failure to instruct the jury, we note that

(overruling *Delli Paoli v. United States*, 352 U.S. 232 (1957)). Akin's statements, as admitted in evidence, complied with *Richardson.* They did not directly implicate Powell. Consequently, the jury could be assumed not to use them against Powell.

However, the prosecution itself upended this assumption. The prosecution's cross-examination of Powell clearly, directly, and repeatedly used Akin's statements against him. Powell was asked to explain Akin's statements, a task he could not perform absent the opportunity for cross-examination. Here, the jury was not left to link the evidence on its own and attempt to "thrust out of mind" Akin's statements with regard to Powell. *Richardson,* 481 U.S. at 208. Rather, the prosecutor, with the criminal defendant in the crucible of cross-examination, drew the jury's attention to Akin's statements and used her statements against him. *Richardson* assumes that there is little danger the jury will improperly use the co-defendant's statements when they are properly modified to avoid implicating the other defendant. Here the prosecution's actions significantly increase the danger of improper use. The prosecutor's use of Akin's statements against Powell is plain error, it is a clear and obvious

---

the obligation is on the defendant, whose failure to request an instruction in this occasion was critical. *See* 21A Charles Allen Wright & Arthur Miller, Federal Practice & Procedure, Evidence § 5066 (2d ed. 2013) ("[A] party triggers the giving of a limiting instruction by requesting one in a timely manner. In the absence of a timely request, the court does not err in failing to give a limiting instruction."). Additionally, because Powell did not allege that the district court erred in failing to give an instruction in his opening brief, this issue is waived on appeal. *See United States v. Pompa*, 434, F.3d 800, 806 n.4 (5th Cir. 2005); Fed. R. App. P. 28(a)(9)(A).

Lastly, even if an instruction had been given to the jury, the prosecutor's actions on cross-examination would have served "to undo the effect of the limiting instruction." *Richardson*, 481 U.S. at 212 (remanding for consideration of a prosecutor's improper use of a co-defendant's otherwise admissible statement). It remains that Akin's statements, as admitted, did not indicate the existence of any other person, and that the prosecutor actively used a non-testifying co-defendant's statements against Powell. In short, the absence of limiting instructions does not alter our analysis of this issue.

violation of a constitutional right that substantially affects the fairness of judicial proceedings. *See Garza*, 429 F.3d at 169.

## C

Nonetheless, a *Bruton* error does not necessarily mandate reversal. *See Schneble v. Florida*, 405 U.S. 427, 430 (1972). "It is well established that a *Bruton* error may be considered harmless when, disregarding the co-defendant's confession, there is otherwise ample evidence against a defendant." *Vejar-Urias*, 165 F.3d at 340 (internal citations and quotations omitted). To find that this violation of a federal constitutional right is harmless, we must be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial. *Id. (*citing *Chapman v. California*, 386 U.S. 18 (1967)). On the other hand, we will find a *Bruton* error not harmless if, "absent the [improper evidence], there was a reasonable probability that the defendants would be acquitted. *Id.* (citing *United States v. Hickman*, 151 F.3d 446, 457 (5th Cir. 1998)).

Powell claims that the *Bruton* error was not harmless beyond a reasonable doubt because all of the other evidence was of questionable veracity. He argues that each witness against him was biased because of cooperation with the government for lesser punishments, that three witnesses were drug dealers and are presumptively not credible. By contrast, he asserts that Akin's statements, given that she is the mother of his child and his girlfriend, would have been given great weight by the jury. Additionally, Powell asserts the physical evidence weighed against conviction. For example, the car did not belong to him or Akin, and neither Powell's nor Akin's fingerprints were found on the individual bags containing crack cocaine found inside the dashboard. Lastly, Powell argues that the prosecutor's role in this *Bruton* violation exacerbates the resulting harm.

This *Bruton* violation is particularly pointed. This is not a case where the government improperly uses a non-testifying co-defendant's statement in closing

argument. This violation occurred during a crucial moment in the evidentiary proceedings, the cross-examination of a criminal defendant. Here, at the very end of cross-examining the defendant, the prosecution repeatedly asked Powell to explain Akin's statements—which, obviously, he could not.

Despite this, we find that substantial independent evidence inculpating the defendants eliminates any reasonable probability that the jury, absent the prosecutor's *Bruton* error, would have acquitted Powell. Powell was caught driving a car loaded with crack cocaine packaged for sale. Several witnesses testified that Powell dealt crack cocaine. Evidence showed a pattern of cooking and selling crack cocaine with Bracy. It also showed a pattern of distributing drugs with Akin. On the day of the arrest, officers followed Powell's car on the expected route between Lubbock and Midland based on Bracy's tip, which was specific and verifiable. During the traffic stop, Powell lied about where he was coming from. Even absent the prosecution's use of Akin's statements against him, it seems that the jury would have concluded that Powell was guilty of the charges in the indictment.

On review of the record, we are convinced beyond a reasonable doubt that the prosecution's error, though legally inexcusable, was harmless in light of the other evidence presented at trial.

## V

The district court sentenced Powell to 188 months of imprisonment and 5 years of supervised release. On appeal, Powell challenges his sentence on two grounds. First, Powell asserts the district court erred in applying a two-level enhancement under U.S. Sentencing Guideline § 3B1.4—the "use of a minor" provision. Second, Powell claims his sentence was unreasonable.

## A

"The determination of whether [a defendant] used or attempted to use a minor to assist in avoiding detection within the meaning of § 3B1.4 is a

conclusion of law that we review de novo, while any findings of fact made in support of that determination we review for clear error." *United States v. Mata*, 624 F.3d 170, 175 (5th Cir. 2010) (per curiam).

Section 3B1.4 allows for a two-level increase in guideline calculations, "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. In *Mata*, we clarified the application of section 3B1.4, determining that it applies when a defendant "makes a decision to bring a minor along during the commission of a previously planned crime as a diversionary tactic or in an effort to reduce suspicion . . . ." *Mata*, 624 F.3d at 175. To trigger the enhancement, a defendant must take "*some affirmative action* to involve the minor in the offense" because the "mere presence of a minor at the scene of the crime is insufficient." *Id.* at 176. (emphasis added) (internal quotations and footnotes omitted). It is not the case that "every defendant who brings a minor child along while smuggling drugs" is subject to the enhancement. *Id.* Rather, district courts "should consider additional circumstantial evidence to determine whether the defendant used the minor to avoid detection." *Id. Mata* requires a purpose driven inquiry. *Mata* was decided against the background of *United States v. Molina*, 469 F.3d 408 (5th Cir. 2006), in which we held the enhancement was not warranted because "there was no evidence that the defendant in a drug-conspiracy case believed that his seventeen year-old girlfriend's presence in the vehicle during the drug run would assist in avoiding detection and there was a plausible alternate explanation for the girlfriend's presence in the vehicle," namely that she was riding from her home to the defendant's. *Mata*, 469 F.3d at 176 (quoting *Molina*, 469 F.3d at 413).

Turning to the instant case, Powell alleges the district court erroneously applied the two-level enhancement based on its conclusion that Powell had put

No. 11-51205

his infant daughter in the backseat to help him avoid detection. He argues the child was merely present in the vehicle. It is clear that Powell's decision to bring his daughter on the previously-planned drug trafficking trip was an "affirmative action" under *Mata. See Mata,* 624 F.3d at 176. "[W]hen a defendant's crime is previously planned—when, for example, she leaves the house knowing she is on her way to smuggle drugs . . . the act of bringing the child along instead of leaving the child behind is an affirmative act that involves the minor in the offense." *Id.* Here, Powell placed his daughter in the car and intentionally drove to meet with Bracy—an affirmative act. However, the facts in this case present a closer question than those in *Mata.*

As in *Molina*, here there is a plausible alternate explanation for the minor's presence in the vehicle. Powell argues that his infant daughter was in the vehicle simply because both parents were in the vehicle and very young children tend to be with their parents. This is especially so, Powell asserts, because Akin and Powell were young parents without means. This argument is not without merit. Unlike *Molina*, however, there is evidence in this case that Powell believed the minor child's presence in the vehicle would assist in avoiding detection. When Powell was questioned about his whereabouts during the traffic stop, he told officers that he was returning from picking up his child at an apartment in Midland. He also denied going to Lubbock—where he had in fact purchased crack cocaine from Bracy. These statements demonstrate use of a minor to avoid detection and provide the additional circumstantial evidence necessary under *Mata.* Powell argues that his daughter was not necessary to the untruthful story he told the officers about his whereabouts—he could have just as easily stated he was at his mother's house. But this is not what was said.

The minor's presence in the car, coupled with Powell's statements, provide the necessary evidence for applying the section 3B1.4 sentence enchantment.

27

No. 11-51205

We hold that the district court did not err in applying the two-level enhancement.

## B

Powell challenges the substantive reasonableness of his sentence. While he did ask for a sentence below guideline range at sentencing, Powell did not raise this reasonableness objection in district court. Therefore, our review of his sentence is for plain error. *United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007). Under this standard, we will disturb the sentencing determination only if "(1) there is error . . . , (2) it is plain; and (3) it affects substantial rights." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). Under *United States v. Booker*, 543 U.S. 220, 261 (2005) finding an "unreasonable" sentence equates to a finding of error. *Peltier*, 505 F.3d at 391.

Powell's sentence of 188 months of imprisonment is on the low end of the calculated guideline range. We apply a presumption of reasonableness to a properly calculated within-guidelines sentence. *United States v. Candia*, 454 F.3d 468, 473 (5th Cir. 2006). The presumption can be rebutted by a showing that the sentence does not account for a factor that should receive significant weight, giving weight to an improper factor, or demonstrating a clear error in judgment in balancing the factors. Here, Powell asserts that the presumption of reasonableness is rebutted because the sentence is "greater than necessary" to achieve the four purposes for criminal sentencing set forth in 18 U.S.C. § 3553(a).[18] Powell claims that his youth, efforts to gain an education, and his young child render the 188-month sentence substantively unreasonable. However, it is clear from the record that the sentencing court took note of these

---

[18] "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." 18 U.S.C. § 3553(a)(2).

No. 11-51205

factors at the sentencing hearing and considered them in issuing the low-guidelines range sentence. Even if we assume that the sentenced imposed is unreasonable and therefore constitutes an error, that error is not plain—it is neither clear nor obvious. The district court explicitly stated that it considered the section 3553(a) factors in rendering its judgment. Under the plain error standard, we will not disturb the sentence imposed merely because an appellant disagrees with the sentence and the balancing of factors conducted by the district court. This within-guidelines sentence is presumptively reasonable and Powell has not rebutted the presumption.

## VI

The judgment of the district court is AFFIRMED.